# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## CASE NO. 16-23972-CIV-O'SULLIVAN
### [CONSENT]

**WILLIAM CHRISTIAN KUNCE,**
                **Plaintiff,**

**v.**

**NANCY A. BERRYHILL,**[1]
**Acting Commissioner of Social Security**
**Administration,**
                **Defendant**.

_____/

## ORDER

THIS MATTER is before the Court on the Plaintiff's Motion for Summary Judgment

(DE# 17, 02/05/17) and the Defendant's Motion for Summary Judgment (DE# 21, 04/17/17 ).

The plaintiff seeks reversal of Commissioner's decision to deny the plaintiff's eligibility for

Social Security Disability Income Benefits under the provisions of the Social Security Act,

Sections 216 (I) and 233 of Title II. In the alternative, the plaintiff asks for a remand for further

administrative proceedings. The Complaint was filed pursuant to the Social Security Act, 42

U.S.C. §405(g) (hereinafter "Act"), and is properly before the Court for judicial review of a final

decision of the Social Security Administration (hereinafter "SSA"). The parties consented to

Magistrate Judge jurisdiction, (DE# 13, 12/21/16), and this matter was referred to the

undersigned for final disposition pursuant to an Order by Judge Moreno. (DE# 16, 12/29/2016).

Having carefully considered the fillings and applicable law, the undersigned enters the following

---

[1] Nancy A. Berryhill is now Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit.

Order.

## PROCEDURAL HISTORY

On April 7, 2015, William Christian Kunce (hereinafter "the plaintiff") protectively filed a Title II application for a period of disability and disability insurance benefits, alleging he became disabled on November 6, 2012. (Tr. 23, 164, 171-78).[2] The application was denied initially and upon reconsideration. (Tr. 23). At the administrative hearing on January 26, 2016, the plaintiff appeared, testified and was represented by counsel. (Tr. 43-75). A vocational expert (hereinafter "VE"), also appeared and testified at the hearing. (*Id.*). On February 16, 2016, the Administrative Law Judge (hereinafter "ALJ") found that the plaintiff was not disabled within the meaning of the Social Security Act. The ALJ's decision became final when the Appeals Council denied the plaintiff's request for review on May 10, 2016. (Tr. 5-11).

## FACTS

I. The Plaintiff's Background

The plaintiff was born on November 8, 1983, and is thirty-three years old. (Tr. 34). The plaintiff completed one year of college education and does not have any vocational or technical training. (Tr. 47). The plaintiff alleges his disability began on November 6, 2012. (Tr. 44). The plaintiff served in the Marine Corps from July 23, 2002, to February 14, 2003, and from January 5, 2004, to March 10, 2006. (Tr. 33). The plaintiff alleges disability due to a combination of mental health impairments, including, bipolar disorder, post-traumatic stress disorder (PTSD),

---

[2] All references to "Tr." refer to the transcript of the Social Security Administration. The page numbers refer to those found on the lower right hand corner of each page of the transcript, as opposed to those assigned by the Court's electronic docketing system or any other page number that may appear.

depression, and anxiety. (Tr. 44-5; DE# 21, 04/17/2017). The plaintiff also alleges he is disabled due to lower back pain and a right shoulder impairment. (DE# 21, 04/17/2017).

The plaintiff's Work History and Disability Reports include prior employment as a flight technician, a roofer helper, and a retail assistant manager. (Tr. 49, 50). The plaintiff worked for three different retail outlets and each position did not last longer than one month. (Tr. 48). The plaintiff also worked as a roofer helper for "[one] month or so" and alleges he stopped working as a roofer helper because he could not "physically keep up." (Tr. 50). Specifically, the plaintiff alleges his shoulder subluxation prevented him from keeping up with the physical aspects of the job. (Tr. 50-51).

The plaintiff testified to having anger outbursts with his children and that he did not think he could control his anger. (Tr. 52-53, 56). The plaintiff also testified that he helps home school his seven-year-old son for half an hour to one hour at a time. (Tr. 52-53). With respect to going outside the home, the plaintiff testified that he is prone to have "more panic attacks when [he's] outside of the house." (Tr. 56-57). The plaintiff further testified that when he does go outside of the home, it is only with his wife and only to the store. (Tr. 56). The plaintiff testified that he frequently traveled from Miami, Florida to Augusta, Georgia due to continuing problems with his living situation. (Tr. 254). The plaintiff testified that he smokes marijuana at least two times per month, that his wife, who is his care giver, buys the marijuana with the care giver salary she receives from the Department of Veterans Affairs (hereinafter "VA"). (Tr. 67).

The plaintiff did not engage in substantial gainful activity (hereinafter "SGA") during the period from his alleged onset date of November 6, 2012, through his date last insured of December 31, 2013. (Tr. 47). The plaintiff last met the insured status requirements of the Social

Security Act on December 31, 2013. (DE # 21, 04/17/2017 at 2).

II. The Plaintiff's Treating Physicians and Relevant Medical Evidence

The plaintiff was examined by several doctors during and after the alleged onset date of disability, including: Dr. Lovorka P. Stojanov, M.D., an internist at the Charlie Norwood VA Medical Center in Augusta Georgia (hereinafter "Augusta VAMC") (Tr. 253-65); Dr. Danielle Suykerbuyk, D.O., a psychiatrist at the Augusta VAMC (Tr. 530); Dr. Maria P. Campos, M.D., an internist at the Miami VA Medical Center (hereinafter "Miami VAMC") (Tr. 464); Dr. Javier I. Cartaya, M.D., a psychiatrist at the Homestead, Florida VA Medical Center (hereinafter "Homestead VAMC") (Tr. 314-21); Dr. Ernesto M. Grenier, M.D., a psychiatrist at the Miami VAMC (Tr. 366); Dr. Zhihong Guo, M.D., a psychiatrist at the Miami VAMC (Tr. 298-9, 347); Dr. Stephanie Friedman, M.D., a psychiatrist at the Miami VAMC (Tr. 913-26); and Dr. Earl Taitt, M.D., an examining psychiatrist at Valencia Psychiatry in Orlando, Florida. (Tr. 927-30).

A. Dr. Lovorka P. Stojanov, M.D.

Beginning on November 16, 2012, the plaintiff received treatment from Dr. Lovorka P. Stojanov M.D. at the Augusta VAMC. (Tr. 261). In Dr. Stojanov's progress note dated November 16, 2012, the plaintiff reported headaches while taking Mobic[3] and requested a change in medication. (*Id.*). In addition, the plaintiff reported issues with irritability and insomnia. (*Id.*). During the November 16, 2012, visit, Dr. Stojanov performed a PHQ-9 Depression Screen[4] on

---

[3] "Mobic (meloxicam) is a nonsteroidal anti-inflammatory drug (NSAID). Mobic works by reducing hormones that cause inflammation and pain in the body." Mobic, Drugs.com, https://www.drugs.com/mobic.html (last visited July 25, 2017).

[4] "PHQ-9 Depression Screen (patient health questionnaire-9) is the Major Depressive Disorder (MDD) module of the full PHQ. A PHQ-9 Depression Screen is used to provisionally diagnose depression and grade severity of symptoms in general medical and mental health

the plaintiff. (Tr. 263). The plaintiff scored a sixteen on the PHQ-9 screening, which, according to Dr. Stojanov, is "suggestive of moderately severe depression."(*Id.*). Dr. Stojanov prescribed the plaintiff Indocin[5] for his lower back pain and ordered a mental health evaluation. (Tr. 262).

B. <u>Dr. Danielle Suykerbuyk, D.O.</u>

On January 9, 2013, the plaintiff was evaluated by Dr. Danielle Suykerbuyk, D.O., for management of his PTSD at the Augusta VAMC. (Tr. 530-32). In Dr. Suykerbuyk's progress note dated January 9, 2013, the plaintiff reported insomnia, nightmares, intrusive thoughts, extreme emotional numbing, impaired concentration, low energy, and alternating psychomotor agitation and retardation. (*Id.*). The plaintiff described episodes of no sleep, increased energy, racing thoughts, pressured speech, euphoric mood, and increased libido. (*Id.*). Dr. Suykerbuyk diagnosed the plaintiff with Bipolar I disorder most recent episode manic without psychotic features, PTSD, cannabis abuse in full sustained remission, nicotine dependence, and a Global Assessment of Functioning (GAF)[6] of 50. (Tr. 532). Dr. Suykerbuyk prescribed the plaintiff

---

settings. It is used to objectively determine initial symptoms severity and monitors symptom changes and effects of treatment over time." PHQ-9 Depression Screen, Mdcalc.com, https://www.mdcalc.com/phq-9-patient-health-questionnaire-9 (last visited July 25, 2017).

[5] "Indocin (indomethacin) is used to relieve pain, swelling, and joint stiffness caused by arthritis, gout, bursitis, and tendinitis. It is also used to relieve pain from various other conditions. This medication is known as a nonsteroidal anti-inflammatory drug (NSAID). It works by blocking your body's production of certain natural substances that cause inflamation." Indocin, Webmd.com, http://www.webmd.com/drugs/2/drug-9252-5186/indocin-oral/indomethacin-oral/details (last visited July 25, 2017).

[6] "Global Assessment of Functioning Scale (GAF) is used to rate how serious a mental illness may be. It measures how much a person's symptoms affect his or her day-to-day life on a scale of 0 to 100. It is designed to help mental health providers understand how well the person can do in everyday activities. The score can help figure out what level of care someone may need and how well certain treatments might work." Global Assessment of Functioning, Webmd.com,

Lithium.[7] (Tr. 533). Dr. Suykerbuyk also reported that the plaintiff was alert and oriented, had good eye contact and grooming, had fair judgment, and that his memory was intact. (Tr. 532).

On January 16, 2013, Dr. Suykerbuyk spoke to the plaintiff via telephone. (Tr. 528). The plaintiff reported that since he started taking lithium, he had a metallic taste in his mouth and some headaches. (*Id.*). Despite these side effects, the plaintiff elected to continue taking Lithium and agreed to have his blood level tested on January 23, 2013. (*Id.*). Dr. Suykerbuyk prescribed the plaintiff Tylenol for his headaches. (*Id.*).The plaintiff called Dr. Suykerbuyk the following day, on January 17, 2013, and stated he had taken Tylenol several times for the headaches and that it was not helping. (*Id.*). The plaintiff also stated he would like to switch to another medication. (*Id.*). Dr. Suykerbuyk prescribed the plaintiff Depakote ER.[8] (*Id.*).

On April 26, 2013, Dr. Suykerbuyk spoke to the plaintiff via telephone. (Tr. 520). According to Dr. Suykerbuyk's notes, the plaintiff was very upset about "everyone dying". (*Id.*). The plaintiff conceded to having trouble remembering to take his medications. (*Id.*). Dr. Suykerbuyk discussed with the plaintiff the importance of medication compliance for his emotional stability and encouraged him to take responsibility for his medication rather than relying on his wife. (*Id.*). Dr. Suykerbuyk noted the plaintiff had a GAF score of 45 and increased

http://www.webmd.com/mental-health/gaf-scale-facts (last visited July 25, 2017).

[7] "Lithium affects the flow of sodium through nerve and muscle cells in the body. Lithium is used to treat the manic episodes of bipolar disorder." Lithium, Drugs.com, https://www.drugs.com/lithium.html (last visited July 25, 2017).

[8] "Depakote ER (divalproex sodium) affects chemicals in the body that may be involved in causing seizures. Depakote ER is used to treat various types of seizure disorders. Depakote ER is also used to treat manic episodes related to bipolar disorder (manic depression), and to prevent migraine headaches." Depakote ER, Drugs.com, https://www.drugs.com/mtm/depakote-er.html (last visited July 25, 2017).

his dosage of Depakote. (Tr. 520-21).

    C. <u>Dr. Maria P. Campos, M.D.</u>

On August 25, 2014, the plaintiff had his initial visit at the Miami VAMC with Maria P. Campos, M.D. (Tr. 464). The plaintiff reported attempting suicide multiple times in the past, but did not presently have any suicidal intent. (*Id.*). Notwithstanding this contention, the plaintiff reported he felt his condition had worsened. (*Id.*). The plaintiff also reported a previous right shoulder surgery and constant chronic pain. (*Id.*). The plaintiff further reported having difficulty sleeping and severe epigastric pain after each meal. (Tr. 467).

 Dr. Campos placed a Patient Record Flag, Category I on the plaintiff's chart, despite the plaintiff's reported lack of suicidal intent. (Tr. 462). The plaintiff was placed on the facility's High Risk for Suicide list the following day on August 26, 2014. (Tr. 462-63). Dr. Campos noted she placed the plaintiff on the facility's High Risk for Suicide list because the plaintiff was depressed, experiencing multiple stressors, and had a strong history of four suicide attempts. (Tr. 463). A rating decision by the Department of Veterans Affairs ("VA") dated September 5, 2014, found the plaintiff to have 100%  service connected disability due to his chronic adjustment disorder with mixed anxiety and depressed mood, effective December 23, 2011. (Tr. 931, 933).

    D. <u>Dr. Javier I. Cartaya, M.D.</u>

On October 9, 2014, the plaintiff was evaluated by Dr. Javier I. Cartaya, M.D., at the Homestead VAMC. (Tr. 314). Dr. Cartaya's assessment of the plaintiff described him as having numerous mood and anxiety symptoms, limited coping skills, and numerous negative distortions in his thinking. (Tr. 320). Dr. Cartaya also noted that the plaintiff had been off his medications for six months.  Dr. Cartaya also noted that the plaintiff  made the decision to see him on his own

accord. (*Id.*). Dr. Cartaya diagnosed the plaintiff with bipolar disorder I, unspecified anxiety disorder, tobacco use disorder, and chronic pain. (*Id.*). Dr. Cartaya also recommended a mood stabilizer but the plaintiff refused. (*Id.*).

E. <u>Dr. Ernesto M. Grenier, M.D.</u>

On October 27, 2014, the plaintiff was evaluated by Dr. Ernesto M. Grenier, M.D. at the Miami VAMC. (Tr. 366). According to Dr. Grenier's progress note, the reason for the plaintiff's visit was to review his record for continuity of care and compliance with his follow up visit because the plaintiff had been identified as a high risk patient. (*Id.*). Dr. Grenier diagnosed the plaintiff with: (1) bipolar I disorder, (2) unspecified anxiety disorder (and ruled out generalized anxiety disorder), (3) history of PTSD, and (4) unspecified personality disorder. (Tr. 367). Dr. Grenier's impression of the plaintiff as a risk for suicide ideations, intent, or plans was low. (*Id.*). Moreover, Dr. Grenier described the plaintiff as having the capacity to make decisions regarding his treatment. (Tr. 370). In support, Dr. Grenier performed a PHQ-2 Depression Screening that resulted in a score of zero, which is a negative screen for depression. (*Id.*).

F. <u>Dr. Zhihong Guo, M.D.</u>

On November 14, 2014, the plaintiff was evaluated by Dr. Zhihong Guo, M.D. at the Miami VAMC. (Tr. 291). The plaintiff reported feeling down, angry with himself, having racing thoughts, and prolonged  latency to falling into sleep. (*Id.*)*.* Dr. Guo reported that the plaintiff was having some paranoid and persecutory delusions. (Tr. 292). A mental status exam indicated that the plaintiff had fair attention and concentration, good hygiene and grooming, was alert, had fair insight and judgment, and had a depressed and anxious mood. (Tr. 296-97). Dr. Guo also reported the plaintiff as having job skills, or capable of being taught because he is cognitively, emotionally

and physically willing to work. (Tr. 297). The plaintiff was reported to be alert and oriented to spheres and free of any altered thought process. (*Id.*).

On January 13, 2015, the plaintiff returned to Dr. Guo. (Tr. 347). The plaintiff reported episodes of frequent mood swing cycles occurring two to three times monthly, changes of sleeping cycles, and less tolerance to small life related stress. (Tr. 348). Accordingly, Dr. Guo's assessment revealed that the plaintiff's response to treatments for bipolar I disorder, nightmares, and PTSD were not improving as expected. (Tr. 346). The plaintiff agreed to start Zyprexa.[9] (Tr. 348). On February 13, 2015, the plaintiff returned to Dr. Guo for a follow up assessment. (Tr. 340). The plaintiff described difficultly falling into sleep, mood swings, feeling anxious, and episodes of mildly elevated mood. (Tr. 341). The plaintiff also complained of back and joint pain. (Tr. 342). The plaintiff's mental status exam indicated, however, that he was calm and cooperative with interview, maintained good eye contact, had fair attention and concentration, and that his level of alertness was intact. (Tr. 343). The plaintiff was prescribed Prazosin[10] and his dose of Zyprexa was increased. (Tr. 346).

At a visit on April 28, 2015, the plaintiff reported compliance with his medication routine absent any side effects. (Tr. 331).The plaintiff also indicated feelings of anxiety and frustration, low levels of concentration and being easily distracted. (*Id.*). The plaintiff further reported

---

[9] "Zyprexa (olanzapine) is an antipsychotic medication that affects chemicals in the brain. Zyprexa is used to treat symptoms of psychotic conditions such as schizophrenia and bipolar disorder (manic depression)." Zyprexa, Drugs.com, https://www.drugs.com/zyprexa.html (last visited July 25, 2017).

[10] Prazosin is prescribed to treat "sleep problems associated with PTSD." Prazosin, Medlineplus.gov, https://medlineplus.gov/druginfo/meds/a682245.html (last visited August 9, 2017).

depressive episodes including: depressed mood, lack of motivation and loss of interest in maintaining hygiene and grooming. (*Id.*). Dr. Guo diagnosed the plaintiff with bipolar I disorder, with rapid cycling, PTSD, unspecified anxiety disorder, cannabis use disorder, a cluster A trait[11], nicotine dependence, GERD[12], and ruled out schizotypal personality. (*Id.*). Dr. Guo indicated the plaintiff's bipolar I disorder, mania episodes, and response to PTSD treatment were improving. (Tr. 337). Dr. Guo increased the plaintiff's dosage of Zyprexa and his dosage of Prazosin. (*Id.*).

On June 5, 2015, after completing a Mental Impairment Questionnaire ("MIQ"), Dr. Guo diagnosed the plaintiff with bipolar I disorder, PTSD, unspecified anxiety disorder, cannabis use disorder, and nicotine dependence. (Tr. 490, 486). The clinical signs included: manic syndrome, grandiose thoughts, difficultly thinking or concentrating, easy distractibility, intrusive recollections of a traumatic experience, hyperactivity, psychomotor agitation, pressured speech, loosening of associations, and decreased sleep. (Tr. 487). Dr. Guo also found that the plaintiff may not be able to handle stress in the workplace, concluding he would likely decompensate if placed in a stressful situation. (Tr. 488).

Dr. Guo identified the plaintiff as having "moderate-to-marked limitations" where his

---

[11] "Cluster A Trait is a type of personality disorder. Cluster A is called the odd, eccentric cluster. It includes Paranoid Personality Disorder, Schizoid Personality Disorder, and Schizotypal Personality Disorders. The common features of the personality disorders in this cluster are social awkwardness and social withdrawal. These disorders are dominated by disoriented thinking." Cluster A Trait, Mentalhelp.net, https://www.mentalhelp.net/articles/dsm-5-the-ten-personality-disorders-cluster-a/ (last visited July 25, 2017).

[12] "GERD (gastroesophageal reflux) is a digestive disorder that affects the lower esophageal sphincter (LES), the right of the muscle between the esophagus and stomach." GERD, Webmd.com, http://www.webmd.com/heartburn-gerd/guide/reflux-disease-gerd-1#1 (last visited July 25, 2017).

symptoms constantly interfere with his ability to perform mental activities in a competitive environment on a sustained and ongoing basis for one-third to two-thirds of an eight-hour workday. (Tr. 489). According to Dr. Guo, these symptoms affected the plaintiff's ability to: understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; perform at a consistent pace without rest periods of unreasonable length or frequency; get along with coworkers or peers without distracting them; and be aware of hazards and take appropriate precautions. (*Id.*). Dr. Guo estimated that the plaintiff would likely be absent from work more than three times per month due to his impairments or treatment. (Tr. 490). On the Mental Impairment Questionnaire, Dr. Guo identified that the plaintiff's first treatment was on September 11, 2009. (Tr. 486). In addition, Dr. Guo opined that the plaintiff's symptoms and related limitations applied far back, but he did not specify how far back they dated. (*Id.*).

G. Stephanie Friedman, M.D.

On July 28, 2015, the plaintiff was evaluated by Dr. Stephanie Friedman, M.D. at the Miami VAMC. (Tr. 736). The plaintiff reported he was no longer taking Prazosin because it made him feel "weak" but continued to take Zyprexa nightly. (*Id.*). The plaintiff also reported continued fluctuations in energy levels, with two to three days of no sleep, two to three times a month. (Tr. 736- 37). Dr. Friedman diagnosed the plaintiff with bipolar disorder I, PTSD, and cannabis and nicotine use disorder. (Tr. 742-43). Dr. Friedman prescribed the plaintiff Lamictal[13] and Zyprexa. (Tr. 742).

At a follow up visit on August 21, 2015, the plaintiff indicated compliance with his

---

[13] "Lamictal (lamotrigine) is used to delay mood episodes in adults with bipolar disorder (manic depression)." Lamictal, Drugs.com, https://www.drugs.com/lamictal.html (last visited July 25, 2017).

medication routine. (Tr. 720). The plaintiff reported feeling "more stable" than he had in the past few years, but that he continued to experience cycling of energy levels with two to three days of increased energy and a decreased need for sleep. (Tr.720-21). Dr. Friedman concluded that the periods of increased energy are associated with poor concentration. (*Id.*). Dr. Friedman described the plaintiff's response to treatment for bipolar I disorder as inadequately controlled. (Tr. 727). The plaintiff agreed to begin individual psychotherapy, but refused a PTSD consultation. (*Id.*).

On October 13, 2015, the plaintiff returned to Dr. Friedman. (Tr. 703-04). The plaintiff reported compliance with his medication absent side effects. (Tr. 704). The plaintiff stated that he had not smoked marijuana in two months. (*Id.*). The plaintiff also reported improvements in his overall mood, decreased impulsivity, and decreased goal-directed activities. (*Id.*). Despite his continued mood fluctuations, the plaintiff noted his "highs" and "lows" lasted for shorter periods of time and that he either slept well or not at all, whereas before he would consistently have interrupted sleep. (*Id.*). Dr. Friedman noted that the plaintiff's response to treatment for bipolar disorder I continued to be inadequately controlled. (Tr. 710). Dr. Friedman increased the plaintiff's dose of Lamictal and prescribed Trazodone.[14] (*Id.*).

In an addendum dated December 11, 2015, Dr. Friedman stated that the plaintiff was totally disabled without consideration of any past or present drug and/or alcohol use. (Tr. 913). Dr. Friedman stated drug and/or alcohol use was not material because the plaintiff was not currently using drugs and/or alcohol and was still disabled. (*Id.*).

---

[14] "Trazodone is an antidepressant medicine. It affects chemicals in the brain that may be unbalanced in people with depression. Trazodone is used to treat major depressive disorder." Trazodone, Drugs.com, https://www.drugs.com/trazodone.html (last visited July 25, 2017).

H. Dr. Earl Taitt, M.D.

On April 29, 2014, at the request of the plaintiff's counsel, Dr. Earl Taitt, M.D. of Valencia Psychiatry in Orlando, Florida, evaluated the plaintiff via telephone because the plaintiff did not have access to transportation. (Tr. 927). Dr. Taitt also reviewed the plaintiff's veteran claim file, which consisted of 745 pages of records including the plaintiff's service medical record, outpatient medical records from the VAMC, and records in support of his various claims for symptoms in 2005 while on active duty in the Marine Corps. (*Id.*). According to Dr. Taitt's progress note, a mental status examination revealed that the plaintiff's mood was anxious, dysphoric, and irritable. (Tr. 929). Dr. Taitt also stated that the plaintiff's thought process was confused, slowed, and inefficient and described the plaintiff as forgetful of facts and events with limited insight. (*Id.*). Dr. Taitt found, however, that the plaintiff's judgment was intact at the time of the evaluation. (*Id.*).

Dr. Taitt diagnosed the plaintiff with PTSD, an adjustment disorder with mixed anxiety and depressed mood, chronic lower back pain, chronic esophageal reflux disease, bilateral conductive hearing loss, and physchosocial stressors. (*Id.*). The plaintiff's GAF assessment resulted in a score of 50. (*Id.*). Dr. Taitt concluded that the plaintiff suffered from service connected mental health impairment beginning in the year 2005 through the present date. (Tr. 929). In Dr. Taitt's opinion, the plaintiff met all of the DSM IV criteria for a diagnosis of both PTSD and an adjustment disorder with anxiety and depressed mood. (*Id.*). Dr. Taitt also found that the plaintiff's psychological symptoms were severe enough for him to be unsuitable for full or part-time employment in any occupation. (*Id.*).

III. <u>Department of Disability Services Psychological Advisors</u>

On June 15, 2015, Lee Reback Psy. D., P.A. (hereinafter "Reback"), a Department of

Disability Services (DDS) medical advisor, and Melissa Rubin (hereinafter "Rubin"), a Disability

Examiner, determined that the plaintiff was not disabled. (Tr. 82-83). To make this determination,

Reback and Rubin evaluated the plaintiff's medical records from the Augusta VAMC and the

Miami VAMC. (Tr. 77-78). Reback found there was insufficient evidence to determine the

plaintiff's restriction of activities, his difficulties in maintaining social functioning, his difficulties

in concentration, persistence or pace, and any repeated episodes of decompensation. (Tr. 80).

Reback further concluded there was insufficient evidence to establish that the plaintiff had an

organic mental, schizophrenic, affective disorder, or an anxiety-related disorder. (*Id.*). Reback also

found that the plaintiff had medically determinable impairments (MDI) from dysfunction to

major joints, spine disorders, anxiety disorders, and affective disorders. (Tr. 79).

With respect to Residual Functional Capacity ("RFC")[15], Reback concluded that the

plaintiff was found to have exertional limitations, which included: (1) that the plaintiff could

occasionally[16] lift or carry 50 pounds; (2) that the plaintiff could frequently[17] lift or carry 25

pounds; (3) that the plaintiff could stand or walk for a total of about six hours in an eight-hour

workday; and (4) that the plaintiff could sit for a total of about six hours in an eight-hour day. (Tr.

---

[15] An individual's RFC is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. In making this finding, the ALJ must consider all of the claimant's impairments that are no severe. *See* 20 C.F.R. §§ 404.1520(e), 404.1545.

[16] "Occasionally" is cumulatively one-third or less of an eight-hour day. (Tr. 81).

[17] "Frequently" is cumulatively more than one-third up to two-thirds of an eight-hour day. (Tr. 81).

81). The plaintiff also had an unlimited exertional limitation to push or pull when lifting or carrying. (Tr. 81). Moreover, the plaintiff had manipulative limitations when reaching in any direction left or right, in front, and/or laterally. (*Id.*). Rubin concluded that the plaintiff "should have been able to engage in SGA as outlined in [the] RFC at the time of his DLI".[18]  (Tr. 82).

## IV. Vocational Expert Testimony

On January 26, 2016, the vocational expert ("VE"), testified at the plaintiff's hearing before the ALJ. (Tr. 41). At the hearing the VE testified the plaintiff's jobs as a flight technician, roofer helper, and assistant manager were performed in the national economy. (Tr. 69). The VE further testified that the plaintiff developed transferable skills from his position as an assistant manger, specifically, customer service skills. (*Id.*). However, the VE found that the transferred skills were limited to the same light exertional level as the plaintiff's previous position as an assistant manager. (*Id.*).

The ALJ posed a hypothetical to the VE of an individual with the same age, education, and past work experience as the plaintiff, possessing the RFC to perform medium work but limited to simple, routine, and  repetitive tasks; with only occasional interaction with the public; and work could be around coworkers throughout the day, but only with occasional interaction. (Tr. 70). Under the ALJ's hypothetical, the VE testified that an individual with these limitations would not be able to perform any of the plaintiff's past work. (*Id.*). The VE did testify that the individual identified in the ALJ's hypothetical could perform jobs such as a linen room attendant, industrial cleaner, and laundry room laborer. (*Id.*; Tr. 71).

The ALJ posed a second hypothetical to the VE, assuming the same limitations as the first

[18] "SGA" is substantial gainful activity.  "DLI" is the date last insured.

hypothetical with the addition of an individual who occasionally climbs ladders, ropes, or

scaffolds; frequently climbs ramps or stairs; frequently stoops, crouches, kneels, or crawls; and

occasionally reaches overhead with the dominant right upper extremity. (*Id.*). The VE testified the

same jobs would be available to an individual within those restrictions as were available to the

individual in the first hypothetical. (*Id.*). Thereafter, the ALJ posed a third hypothetical to the VE,

assuming all of the same limitations in hypothetical one and two, and adding "due to pain and

mental deficits, this person cannot sustain sufficient concentration, persistence, or pace for an

eight-hour day work schedule." (*Id.*). The VE testified there were no jobs in the local or national

economy that such an individual could perform. (*Id.*). The VE did testify, however, that the list of

jobs provided for hypotheticals one and two were a representative sample of the United States and

Florida. (Tr. 72).

Relying on the ALJ's first hypothetical, counsel for the plaintiff examined and questioned

the VE. (Tr. 73). Counsel began by stating the following:

> Q: . . . . And if we also included marked limitations in the following
> areas–and for purposes of this question, marked is the symptoms
> constantly interfere with the ability to perform the activity;
> understand and remember detailed instructions; carry out detailed
> instructions; maintain attention, concentration for extended periods;
> perform at a consistent pace without rest periods of an unreasonable
> length or frequency; may get along with coworkers or peers without
> distracting them; be aware of hazards and take precautions. If the
> claimant, in addition to the original hypothetical, had those
> additional marked limitations, would he be able to perform any of
> his past relevant work?

(*Id.*).

In response to counsel's hypothetical question, the VE testified, "No." (*Id.*). Counsel then asked

the VE if such a person would be able to perform any other work existing in significant numbers

in the national economy. (*Id.*). The VE indicated that such a person would not be able to do so. (*Id.*). When the VE was asked if the plaintiff were absent from work more than three times per month, if he would be able to maintain work at any exertional or skill level, the VE indicated that the plaintiff would not be able to do so. (Tr. 74). The VE testified "[a] person could miss one day per month and still maintain employment. Anything beyond that on a consistent basis would preclude work." (*Id.*).

## THE ALJ'S DECISION-MAKING PROCESS

"Disability" is defined as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can last for a continuous period of not less than twelve months . . . ." 42 U.S.C. §§ 416(I); *See, e.g.*, 423(d)(1) (2015); 20 C.F.R. § 404.1505 (2005). The impairment(s) must be severe, making the plaintiff "unable to do his previous work . . . or any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(1); 20 C.F.R. § 404.1505-1511 (2005).

Under the authority of the Social Security Act, the ALJ must apply a five-step sequential analysis to determine whether an individual is entitled to disability benefits. *See* 20 C.F.R. § 404.1520(a)-(f). First, the ALJ must determine whether the claimant is engaging in substantial gainful activity[19]. 20 C.F.R. § 404.1520(b). If the ALJ finds an individual engages in substantial gainful activity ("SGA"), he is not disabled and the inquiry ends.

Second, the ALJ must determine whether the claimant has a medically determinable severe

---

[19]"Substantial work activity" is defined as work activity that involves doing significant physical or mental activities. 20 C.F.R. § 404.1572(a)."Gainful work activity" is work that is usually done for pay or profit, whether or not a profit is realized. 20 C.F.R. § 404.1572(b).

impairment or a combination of severe impairments.[20] 20 C.F.R. § 404.1572(c). If the claimant

does not, then a finding of non-disability is made and the inquiry ends. Third, the ALJ compares

the claimant's severe impairments to those in the listing of impairments located in 20 C.F.R Part

404, Subpart P, Appendix I. 20 C.F.R. §§ 404.1572(d), 404.1525, 404.1526. Certain impairments

are so severe, whether considered alone or in conjunction with other impairments, that if such

impairments are established, the regulations require a finding of disability without further inquiry

into the plaintiff's ability to perform other work. *See Gibson v. Heckler*, 762 F.2d 1516, 1518 n.1

(11th Cir. 1985). If the impairment meets or equals a listed impairment, disability is presumed,

and benefits are awarded. 20 C.F.R. § 404.1520(d).

Fourth, the ALJ must determine whether the claimant has the RFC to perform the

requirements of his past relevant work. 20 C.F.R. § 404.1520(f). This determination takes into

account "all relevant evidence," including medical evidence, the claimant's own testimony, and

the observations of others. *See* 20 C.F.R. §§ 404.1545(a)(1). If the claimant is unable to perform

his or her past relevant work, then a prima facie case of disability is established and the burden of

proof shifts to the Commissioner to show at step five that there is other work available in the

national economy that the plaintiff can perform.20 C.F.R. §§ 404.1520(e); *see Barnes v. Sullivan*,

932 F.2d 1356, 1359 (11th Cir. 1991) (holding the claimant bears the initial burden of proving

that he is unable to perform previous work.). Fifth, if the claimant cannot perform his or her past

relevant work, the ALJ must determine if he or she is capable of performing any other work in the

national economy. 20 C.F.R. § 404.1520(g).

---

[20]An impairment or combination of impairments is "severe" if it significantly limits an individual's ability to perform basic work activities.

On February 16, 2016, the ALJ found that the plaintiff was not disabled under the relevant sections of the Social Security Act from November 6, 2012, through the last date insured, December 31, 2013. (Tr. 23, 36). The ALJ found at step one that the plaintiff had not engaged in substantial gainful activity since November 6, 2012. (Tr. 25, Finding no. 2).

At step two, the ALJ found that the plaintiff had severe impairments of PTSD and bipolar disorder through the date last insured. (Tr. 25, Finding no. 3). Accordingly, the ALJ found these impairments caused more than minimal functional limitations in terms of the plaintiff's ability to perform basic work activities. (*Id.*).

At step three, the ALJ found that the plaintiff did not have a severe impairment or combination of impairments that met or equal one of the listed impairments found in Appendix I to Subpart 404 of the Code of Federal Regulations. 20 C.F.R Part 404, Subpart P, Appendix I; (Tr. 26, Finding no. 4). In making this finding, the ALJ considered whether the "paragraph B" criteria[21] was satisfied. (*Id.*). The ALJ considered that the plaintiff frequently traveled between Georgia and Florida, cared for his family, made housing arrangements for his family, and arranged for his medical care as needed. (*Id.*). With regard to the activities of daily living, the ALJ found that the plaintiff had a mild restriction. (*Id.*) The ALJ also concluded that the plaintiff had moderate difficulties in social functioning. (Tr.27). Additionally, the ALJ found that the plaintiff

---

[21] "Paragraph B of each listing (except 12.05) provides the functional criteria we assess, in conjunction with a rating scale (see 12.00E and 12.00F), to evaluate how your mental disorder limits your functioning. These criteria represent the areas of mental functioning a person uses in a work setting." Disability Evaluation Under Social Security, ssa.gov, https://www.ssa.gov/disability/professionals/bluebook/12.00-MentalDisorders-Adult.htm (last visited August 24, 2017).

had moderate difficulties in concentration, persistence, and pace. (*Id.*). In making this determination, the ALJ weighed: (1) the plaintiff's examining psychiatrist's note that the plaintiff's memory was intact and was stable for outpatient treatment; (2) the fact that the plaintiff arranged housing for his family and frequently traveled between Georgia and Florida; and (3) the fact that the plaintiff did not seek the type of treatment "one would reasonably have expected for someone who had any greater functional limitations." (*Id.*). As for episodes of decompensation, the ALJ found there was no medical evidence of record showing that the plaintiff had experienced any episodes of decompensation. (*Id.*).

At step four, the ALJ found that through the date last insured, the plaintiff had the RFC to perform medium work as defined in 20 C.F.R. § 404.1567(c). (Tr. 28). The ALJ also found that the plaintiff was limited to simple, routine, and repetitive tasks, with only occasional interaction with the public and only occasional interaction with co-workers. (*Id.*). The ALJ considered the plaintiff's RFC and found "[t]hrough the date last insured, he was unable to perform any past relevant work." (Tr. 34).The ALJ further concluded the plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but, the plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible. (Tr. 34).

Specifically, the ALJ found that the plaintiff's inconsistent statements in support of his application suggesting his allegations were not entirely reliable included the fact that the plaintiff testified that he argues with his wife and did not think he could control his anger and then subsequently stated his wife is his "care giver" and helps control his anger. (Tr. 33-34). The ALJ also found that the plaintiff was unreliable because the plaintiff stated if he goes to counseling and

takes his mediation, he can control his anger, but the evidence shows the plaintiff elected not to participate in counseling during the "period of issue." (*Id.*). The plaintiff also testified that he smokes marijuana at least two times per month, but the plaintiff previously stated that one year prior he used marijuana more than once or twice a month. (*Id.*).

At step five, the ALJ concluded, "[t]hrough the date last insured, . . . there were jobs that existed in significant numbers in the economy that [the plaintiff] could have performed." (*Id.*). The ALJ found jobs existed in significant numbers in the national economy that the plaintiff could perform, including working as a linen room attendant, industrial cleaner, and laundry room laborer. (Tr. 35). In support, the ALJ evaluated whether the plaintiff had the RFC to perform the "full range of medium work," a finding which establishes the plaintiff is "non disabled." The ALJ found that the plaintiff's ability to perform the requirements of the full range of medium work was "impeded by additional limitations." (*Id.*). The ALJ noted however, that even if the plaintiff engaged in occasional climbing of ladders, ropes or scaffolds; frequent climbing of ramps or stairs; frequent stooping, crouching, kneeling or crawling, the plaintiff could still perform the jobs indicated by the VE. (*Id.*). Based on the plaintiff's medical records and the VE's testimony, the ALJ concluded that the VE's testimony was consistent with the information contained in the Dictionary of Occupational Titles. (Tr. 35-36).

## STANDARD OF REVIEW

The Court must determine if it is appropriate to grant either party's motion for summary judgment. Judicial review of the factual findings in disability cases is limited to determining whether the record contains substantial evidence to support the ALJ's findings and whether the correct legal standards were applied. 42 U.S.C. § 405(g) (2006); *See Wolfe v. Chater*, 86 F.3d

1072, 1076 (11th Cir. 1996) (holding the reviewing court must not re-weigh evidence or substitute its discretion). On judicial review, decisions made by the defendant and the Commissioner of Social Security, are conclusive if supported by substantial evidence and if the correct legal standard was applied. 42 U.S.C. § 405(g) (2006); *Kelley v. Apfel*, 185 F.3d 1211, 1213 (11th Cir. 1999).

Substantial evidence is more than a scintilla, but less than a preponderance. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *See also, Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). Accordingly, substantial evidence is relevant evidence that a reasonable person would accept as adequate to support the ALJ's conclusion. *Richardson*, 402 U.S. at 401. Moreover, when determining whether substantial evidence exists, "[t]he court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the decision." *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995). However, this restrictive standard of review applies only to findings of fact.

As such, no presumption of validity attaches to the Commissioner's conclusions of law, including the determination of the proper standard to be applied when reviewing claims. *See Cornelius v. Sullivan*, 936 F.3d 1143, 1145-46 (11th Cir. 1991) (finding a "[c]ommisioner's failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining the proper legal analysis has been conducted mandates reversal."); *accord Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). In fact, the reviewing court must be satisfied that the decision of the Commissioner is grounded in the proper application of the appropriate legal standards. *Davis v. Shalala*, 985 F.2d 528, 531 (11th Cir. 1993). However, the court may not decide facts anew, re-weigh evidence, or substitute its judgment for that of the ALJ. *Miles v.*

*Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996). Even if the evidence weighs against the Commissioner's decision, the reviewing court must affirm the decision if the decision is supported by substantial evidence. *Id*. at 1400.; *See also Baker v. Sullivan*, 880 F.2d 319, (11th Cir. 1989). Although, factual evidence is presumed valid, the legal standard is not. *Martin*, 894 F.2d at 1529. Thus, the Commissioner must apply the correct legal standard with sufficient reasoning to avoid reversal. *Id*.

## LEGAL ANALYSIS

The plaintiff contends that the ALJ's decision was not based on substantial evidence. (DE# 17, 02/05/2017, at 10). First, the plaintiff contends the ALJ did not properly consider and weigh the medical evidence. (*Id.*). Second, the plaintiff asserts substantial evidence demonstrates that the plaintiff had additional limitations prior to the expiration of his insured status on December 31, 2013. (*Id.*).Third, the plaintiff argues the ALJ failed to consider the VA disability determination. (DE# 17, 02/05/2017, at 16). Fourth, the plaintiff asserts the ALJ failed to properly evaluate the plaintiff's credibility. (DE# 17, 02/05/2017, at 17). Finally, the plaintiff asserts the ALJ relied on the VE's flawed testimony. (DE# 17, 02/05/2017, at 19). The undersigned finds that the ALJ's findings are substantially justified by the record and that the ALJ's decision should be affirmed.

## I. THE ALJ PROPERLY CONSIDERED AND WEIGHED THE MEDICAL OPINION EVIDENCE.

Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of the plaintiff's impairments, including a plaintiff's symptoms, diagnosis, and prognosis; what the plaintiff can do despite her impairments; and the plaintiff's

physical or mental restrictions. *Winschel v. Comm'r of Soc. Sec.*, 631 F 3d. 1176, 1178-79 (11th Cir. 2001). Procedurally, the ALJ must "articulate the weight given to different medical opinions and the reasons therefore." *Id*. at 1179. A medical opinion is "entitled to controlling weight only if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the record as a whole." *See* C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); Social Security Ruling (SSR) 96-2p, 1996 WL 374188. Good cause exists to discount a treating physician's opinion when the opinion is not bolstered by the evidence; the evidence supports a contrary finding; or the treating physician's opinion was conclusory or inconsistent with the doctor's own medical records. *Mason v. Comm'r of Soc. Sec.*, 430 F. App'x 830, 834 (11th Cir. 2011) (quoting *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41(11th Cir. 2004)). When a treating physician's opinion does not warrant controlling weight, the ALJ must weigh

> [t]he medical opinion based on the length of the treatment relationship and the frequency of examination; the nature and extent of the treatment relationship; the medical evidence supporting the opinion; consistency with the record as a whole; specialization in the medical issues at issue; and other facts which tend to support or contradict the opinion.

20 C.F.R. § 404.1527(c)(2)-(6).

A. Dr. Zhihong Guo, M.D.

The plaintiff asserts that the ALJ improperly considered the plaintiff's treatment history when assigning little weight to Dr. Guo's opinion. Contrary to the plaintiff's assertions, the ALJ properly considered the plaintiff's treatment history and its supportability when determining the weight given to Dr. Guo. *See* 20 C.F.R. §§ 404.1527(c)(2) (treatment relationship), 404.1527 (c)(2)(I) (length of treatment relationship and frequency of examination), 404.1527 (c)(3)

(supportability); e.g. *Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987) (physician opinions after the expiration of the claimant's insured status not relevant to claimant's pre-insured status condition). In the *Mason* case, the Eleventh Circuit Court noted that a retrospective diagnosis, which is a physician's post-insured-date opinion, is considered only when the opinion is consistent with pre-insured-date medical evidence. *See Mason*, 430 F. App'x at 832.

The ALJ is entitled to consider the plaintiff's treatment history to determine the weight to give to Dr. Guo's opinion. Further, when considering what weight to give to the opinions of record, the ALJ considered the date of the opinion, general treatment history, treatment history prior to the plaintiff's date last insured, the purpose for the opinion, the limitations contained in each opinion, the opinion's consistency with the plaintiff's treatment, and the physician's speciality. (Tr. 32-33).

The undersigned finds that the ALJ properly determined that Dr. Guo is not a treating source just because he had "access" to treatment records at the Miami VAMC. *See* 20 C.F.R. § 404.1502. To be considered a treating source, Dr. Guo must have treated the plaintiff and had an ongoing treatment relationship with the plaintiff. (*Id.*) The plaintiff was not treated by Dr. Guo or at the Miami VAMC during the relevant period. *See Mason*, 430 F. App'x at 832-33 (finding the doctor's opinion was "[a] retrospective diagnosis that was not entitled to deference unless corroborated by contemporaneous medical evidence of a disabling condition."). As noted by the ALJ, the plaintiff's first visit with Dr. Guo was on August 25, 2014, and the plaintiff underwent a psychiatric evaluation with Dr. Guo on November 14, 2014, at the Miami VAMC. (Tr. 32, 485-90).

The plaintiff was not taking any medication and had not undergone treatment when he first underwent psychiatric treatment with Dr. Guo at the Miami VAMC. (Tr. 32, 485-90). The ALJ also noted that Dr. Guo relied on the wrong date of treatment in support of his opinion. (*Id.*). Dr. Guo statement that the plaintiff's first date of treatment was on September 11, 2009, is not supported elsewhere in the record. (*Id.*).The only period at issue in this matter is from November 6, 2012, to December 31, 2013, and Dr. Guo did not indicate that his opinion referred back to the period on or before December 31, 2013. (*Id.*). The undersigned finds that the ALJ did not err in the amount of weight she gave to Dr. Guo's opinion.

B. Dr. Earl Taitt, M.D.

The ALJ did not err in giving little weight to Dr. Taitt's opinion and properly considered Dr. Taitt's mental status examination of the plaintiff and the mental status examination from the relevant period. The ALJ demonstrated that she fully considered the plaintiff's medical records, specifically, Dr. Taitt's opinion. The ALJ indicated that on April 29, 2014, a psychiatric evaluation was conducted by Dr. Taitt by telephone, at the request of the plaintiff's counsel, *months after* the date the plaintiff was last insured. (Tr. 32) (emphasis added). Moreover, the ALJ also noted that the plaintiff denied any inpatient psychiatric treatment and reported he was taking 2000 mg of Depakote at night but did not identify a primary care provider or treating psychiatrist at that time. (*Id.*; Tr. 927-29). The plaintiff's last and highest prescribed dose of record for Depakote was in January 2013, for 1000 mg of Depakote nightly at bedtime. (Tr. 528).

The undersigned finds that the ALJ followed proper procedure in evaluating Dr. Taitt's opinion. The ALJ properly considered Dr. Taitt a nontreating, nonexamining source. In making this determination, the ALJ considered the following:

1) Dr. Taitt's specialty as a psychiatrist;
2) Dr. Taitt's location in Orlando, Florida;
3) Dr. Taitt's facility at Valencia Psychiatry in Orlando, Florida, where the plaintiff had not previously been treated;
4) the date of the plaintiff's evaluation on April, 29, 2014, which was not done within the relevant period;
5) Dr. Taitt's method of evaluation via telephone; and
6) the purpose of the evaluation, which was to support the plaintiff's claim for disability.

(Tr. 32). Under the Code of Federal Regulation, a nontreating source means a physician, psychologist, or other acceptable medical source who has examined someone but does not have, or did not have, an ongoing treatment relationship with the individual. 20 C.F.R. § 404.1502. A nonexamining source means a physician, psychologist, or other acceptable medical source who has not examined an individual but provides a medical or other opinion in that person's case. 20 C.F.R. § 404.1502; *see generally*, *Robinson v. Barnhart*, 366 F.3d 1078, 1083 (10th Cir. 2004) ("[a] psychological opinion may rest either on observed signs and symptoms or on psychological tests . . . thus, [the doctor's] observations about claimant's limitations do not constitute specific medical findings."). Moreover, "because mental disabilities are difficult to diagnose without subjective, in-person examination, the treating physician rule is particularly important in the context of mental health." *Canales v. Comm'r of Soc. Sec.*, 698 F.Supp.2d 335 (E.D. NY 2010) (quoting *Richardson v. Astrue*, No. 09-CV-1841, 2009 WL 4793994, at *7 (S.D.N.Y. Dec. 14, 2009)).

Dr. Taitt is a nontreating, nonexamining doctor, and, accordingly, his opinion is entitled to less weight. *See* 20 C.F.R. § 404.1527(c)(1) ("Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you."). Thus, the ALJ did not err when she attributed little weight to Dr. Taitt's opinion. Further, the ALJ's

consideration of the purpose of Dr. Taitt's report and her rejection of his opinion is supported by case law. *See Reddick v. Chater*, 157 F.3d 715, 726 (11th Cir. 1998) (noting "[a] doctor's opinion in a letter requested by counsel" may be rejected "[w]here the opinion was unsupported by medical findings, [or] personal observations."). There is no evidence that Dr. Taitt personally observed the plaintiff. (Tr. 32). Moreover, the ALJ properly concluded that Dr. Taitt's opinion of disability did not coincide with the level of treatment the plaintiff was undergoing.[22] (Tr. 32, 528, 928-29). Accordingly, the ALJ properly determined Dr. Taitt's opinion is entitled to little weight. *See Hughes v. Comm'r of Soc. Sec. Admin.*, No. 11-16021, 2012 WL 3124866, at *2 (11th Cir. Aug. 2, 2012) (noting the doctor's opinions were not based on claimant's condition during the period at issue and thus, the "[o]pinions were not particularly relevant to whether [claimant] was disabled for purposes of DIB.").

II. SUBSTANTIAL EVIDENCE SUPPORTS THE ALJ'S DETERMINATION THAT THE PLAINTIFF FAILED TO ESTABLISH HE HAD ADDITIONAL LIMITATIONS PRIOR TO THE EXPIRATION OF HIS INSURED STATUS.

The ALJ applied the correct legal standards substantiated by the evidence. An ALJ determines a plaintiff's ability to perform his past relevant work at step four or other work at step five by assessing a plaintiff's RFC. *See* 20 C.F.R. §§ 404.1520(e), 404.1527(d)(2) (stating assessment of a claimant's RFC is reserved for the Commissioner).; *see also Robinson*, F. App'x at 999 ("[t]he task of determining a claimant's [RFC] and ability to work is within the province of the ALJ, not of the doctors.").

---

[22] As noted by the ALJ, the plaintiff had no primary care physician, no treating psychiatrist, no inpatient treatment, and no medical orders from a psychiatrist to take a double dosage of the medication. (Tr. 32); *see also* 20 C.F.R. § 404.1527(c)(3) ("Supportability. The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.").

With respect to the plaintiff's RFC, the ALJ considered the relevant evidence, including the reports and opinions from the medical sources. (Tr. 28-32, finding No. 5).The ALJ cited the following evidence in support of her RFC assessment: (1) the plaintiff's medical history, which showed the plaintiff underwent only one vis-a-vis psychiatric evaluation during the relevant period (Tr. 29, 252-990); (2) medical signs, such as alertness, orientation, good eye contact, grooming, memory, insight, and judgment (Tr. 30, 532, 663); (3) the PHQ-9 Depression screen showing the plaintiff had moderately severe depression and the lack of laboratory reports proving the plaintiff complied with taking his pyschotropic medication for post-traumatic stress disorder and bipolar disorder (Tr. 29-32, 63-64, 348, 520, 528); (4) the plaintiff's inconsistent statements about medication compliance, such as, inconsistent statements about the dosage of the medications (Tr. 32, 467, 497); (5) the plaintiff's treatment, specifically, the type recommended, gaps in treatment, effectiveness of treatment, lack of compliance with treatment recommendations for his mental health but compliance with physical therapy (Tr. 29-33, 64, 255-56, 377, 528-29, 532-33); (6) the plaintiff's reports that he moved out of state, home schooled his children, and was independent in his activities of daily living (Tr. 29.32, 64, 66, 254, 918-19); (7) the medical opinions of record (Tr. 32-33,76-94); and (8) the plaintiff's own admissions and hearing testimony that his treatment alleviated his symptoms. (Tr. 30, 33-34, 53-54, 59, 254, 576). The plaintiff, however, asserts that the ALJ cited no evidence in support of the RFC assessment. (Pl.'s Br. at 15). In addition, the plaintiff suggests that the ALJ's RFC assessment is not based on substantial evidence where it is not based on a medical opinion or is contradicted by a medical doctor's opinion. (*Id.*). Under SSR 96-8p, relevant evidence for assessing a claimant's RFC consists of:

1) medical history,
2) medical signs and laboratory findings,
3) the effects of treatment, including limitations or restrictions imposed by the mechanics of treatment,
4) reports of daily activities,
5) lay evidence,
6) recorded observations,
7) medical source statements,
8) effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment,
9) evidence from attempts to work,
10) need for a structured living environment, and
11) work evaluations, if available.

SSR 96-8p, 1996 WL 374184, *5 (S.S.A. July 2, 1996). Despite the abovementioned contemporaneous types of evidence that a claimant can use to show they are disabled, the plaintiff did not satisfy his burden of providing evidence establishing he was as limited as he alleged. (Tr. 29-34, 53-54, 59, 63-64, 255-56, 348, 377, 520, 528-29). As the ALJ indicated, out of 750 pages of medical evidence, the plaintiff only cites three treatment notes from 2012 to 2013 to support his contention that he proffered sufficient evidence for the ALJ to conclude he was disabled. (Pl.'s Br. at 3-4). The plaintiff's assertion that the ALJ did not cite any specific material facts or to any persuasive nonmedical evidence that supports the RFC is unsubstantiated. (Pl.'s Br. at 3-4; Tr. 28-34). *See* 20 C.F.R. §§ 404.1545(a)(3). Contrary to the plaintiff's assertion, the ALJ did credit relevant medical opinions in the record and other evidence demonstrating the plaintiff's functional capacity. (*Id.*) Further, the ALJ's assessment of the plaintiff's RFC is adequately supported by the evidence. (*Id.*)

## III. THE ALJ PROPERLY CONSIDERED THE DEPARTMENT OF VETERAN AFFAIRS' DETERMINATION.

The ALJ properly considered the increased Veteran Affairs ("VA") rating from 50% to 100% disabled and the evidence upon which the VA decided to increase the rating. (Tr. 28-34). The ALJ correctly gave "some weight" to the VA disability rating determination. (Tr. 33). For Social Security purposes, "[the plaintiff] is entitled to disability insurance benefits, when he proves he is under a disability, meaning he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment."*Ostoborg v. Comm'r of Soc. Sec.*, 610 F. App'x 907, 914 (11th Cir. 2015) (citing 38 U.S.C. § 5107) (quotations omitted). The VA generally "will grant total disability, when there is present any impairment of mind or body which is sufficient to render it impossible for the average person to" participate in a substantially gainful occupation. *Ostoborg*, 610 F. App'x at 914 (citing 38 C.F.R. § 3.34(a)(1)) (quotations omitted). In fact, the VA "shall give the benefit of the doubt to the [the plaintiff,] whenever there is an approximate balance of positive and negative evidence regarding any issue of material to the determination of a matter." *Id.* (citing 38 U.S.C. § 5107) (quotations omitted). The ALJ concluded that a VA disability determination "[d]oes not guarantee that a veteran claimant will receive Social Security disability benefits." (Tr. 33). In making this determination, the ALJ considered the different standards used by the Social Security Act and the VA. In addition, the VA's determination is not binding. *See* 20 C.F.R. § 404.1504; Social Security Ruling (SSR) 06-3p, 71 Fed. Reg. 45,593 (2006).

The undersigned finds that the ALJ properly evaluated the medical evidence under the standards provided by the Social Security Act. The ALJ expressly considered and closely

scrutinized the VA rating after examining the VA medical records, and the diagnoses upon which it is based. (Tr. 28-34). As in *Ostoborg*, the ALJ here correctly explained that the VA and the SSA use different criteria when determining disability. *Ostoborg,* 610 F. App'x at 914.; *see also, Adams v. Comm'r of Soc. Sec.*, 542 F. App'x 854, 857 (11th Cir. 2013).

The plaintiff incorrectly places unwarranted reliance on *Brady v. Heckler*, 724 F.2d 914, 921 (11th Cir. 1984), because the facts there are clearly distinguishable from the present case. The plaintiff in *Brady* suffered from pericarditis, hypoglycemia, vertebro vascular insufficiency, mental depression, and possible emphysema. *Id*. Additionally, in *Brady*, the plaintiff's severe impairment was supported by substantial medical evidence. *Id*. Accordingly, the Eleventh Circuit in *Brady*, found "[a]lthough the V.A.'s disability rating is not binding on the Secretary of Health and Human Services, it is evidence that should be given great weight" because the VA's disability rating was supported by substantial evidence. *Id.* at 921 (citations omitted).

In this case, the medical evidence does not show that the plaintiff was as functionally limited as he alleged during the period at issue, or that the plaintiff sought the type of treatment reasonably expected for a truly disabling impairment.[23] In addition, as discussed in the next section, the plaintiff also made several inconsistent statements in support of his application, which suggests that the allegations are not entirely reliable. (*Id.*).

## IV. THE ALJ PROPERLY EVALUATED THE PLAINTIFF'S CREDIBILITY.

The ALJ properly considered the plaintiff's subjective complaints of disabling pain, other

---

[23] In support, the ALJ further stated "[o]n June 15, 2015, and August 7, 2015, two different DDS psychological advisors reviewed the record and opined that there was insufficient medical or 'clinical' evidence of record to fully evaluate the claimant's mental impairments during the period at issue." (Tr.33).

symptoms, and the credibility of his allegations in deciding his claim. (Tr. 28-34). To establish a disability based on a claimant's subjective complaints, the claimant must provide evidence of an underlying medical condition and either objective medical evidence confirming the severity of the alleged symptoms or a medical condition that can reasonably be expected to give rise to the claimed pain. *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (citing *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991)); 20 C.F.R. § 404.1529. Where the objective medical evidence does not confirm the severity of the alleged symptoms, but the claimant establishes he has an impairment that could reasonably be expected to produce his symptoms, the intensity and persistence of a claimant's symptoms and the effect on his ability to work must be evaluated. 20 C.F.R. § 404.1529(c)(1); SSR 96-7p, 61 Fed. Reg. 34,483 (1996).

The plaintiff failed to provide evidence in support of his subjective complaints concerning his disabling pain and other symptoms prior to the expiration of his insured status. The ALJ stated that the objective medical and other evidence from the relevant period does not indicate that the plaintiff's condition caused disabling limitations. (Tr. 28, Finding no. 5). Rather, the objective medical and other evidence from the relevant period provides substantial evidence the plaintiff could perform medium work but was limited to simple, routine, and repetitive tasks, with only occasional interaction with the public and only occasional interaction with coworkers. (Tr. 28, Finding no. 5); *see* 20 C.F.R. § 404.1529(c)(2)-(4); *see also Wilson*, 284 F.3d at 1226. Similar to the plaintiff in *Wilson*, here, the plaintiff's complaints of symptoms, a diagnosis of PTSD and a diagnosis of bipolar disorder, do not show that his impairments were as limiting as he claimed. *See Wilson*, 284 F.3d at 1226 (finding the claimant's allegations were inconsistent with activities of daily living, limited use of pain medication, and effectiveness of treatment, and were therefore

found not credible to the extent that the claimant was precluded from working).

Further, "[t]he severity of a medically ascertained disability must be measured in terms of its effect upon ability to work, and not simply in terms of deviation from purely medical standards of bodily perfection or normality." *McCruter v. Bowen*, 791 F.2d 1544, 1547 (11th Cir. 1986). Substantial evidence in the record supports the ALJ's finding because the medical and other evidence was not consistent with the plaintiff's alleged pain. *Id*. In fact, the records from the relevant period do not indicate that the plaintiff's mental condition was as limiting as he claimed on or before December 31, 2013. *Id*.; *see also Edwards v. Sullivan*, 937 F.2d 580, 584 (11th Cir. 1991). The DDS psychological advisors also concluded that the plaintiff provided insufficient evidence that his mental impairments resulted in disabling limitations (Tr. 75-83) which further undermines the plaintiff's subjective complaints of disabling pain and other symptoms. *See* 20 C.F.R. § 404.1529(c)(3), (4); SSR 96-7p.

In addition, the plaintiff's treatment history provides additional evidence undermining his allegations of disabling mental limitations. *See* 20 C.F.R. § 404.1529(c)(3)(v); SSR 96-7p; *Watson v. Heckl*er, 738 F.2d 1169, 72-73 (11th Cir. 1984) (finding "[t]he objective medical findings . . . would not commensurate with a total inability to perform all levels of work activity but rather only heavier levels of exertion."). In *Watson*, the ALJ considered the objective medical evidence, the plaintiff's use of pain-killers, his failure to seek treatment until after the denial of benefits, and his daily activities as testified at the hearing. *Id*. at 1173. Similarly, the plaintiff in this case went several months without taking medication or seeking treatment for his alleged mental health symptoms, when his previous treatment consisted of taking medication. (Tr. 28-34, 63). Similar to the plaintiff in *Watson*, here, the plaintiff's treatment history suggests the limited

medication he was prescribed during the relevant period controlled his mental impairments. *See Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) (noting that a symptom reasonably controlled by medication or treatment is not disabling); *see also Houston v. Sec'y of Health and Human Servs.*, 736 F. 2d 365, 367 (6th Cir. 1986) (finding impairments controlled by medications are not severe). In support, the ALJ further stated "[o]n June 15, 2015, and August 7, 2015, two different DDS psychological advisors reviewed the record and opined that there was insufficient medical or 'clinical' evidence of record to fully evaluate the claimant's mental impairments during the period at issue." (Tr.33). Substantial evidence supports the ALJ's finding that the plaintiff's allegations of disabling mental health symptoms prior to the expiration of his insured status were not totally credible.

The plaintiff claims his mental impairments prevented his compliance with the instructions and recommendations of his doctors. (Pl's. Br. at 18-19). The plaintiff believes this is sufficient evidence for an automatic determination by the ALJ that mental impairments prevent medication and treatment compliance. (*Id.*). The record, however, as observed by the ALJ, indicated that the plaintiff had fair insight, judgment, arranged for mental health treatment as needed, traveled from Georgia to Florida, took care of his family, and made housing arrangements. (Tr. 26, 532).The record also shows that the plaintiff did not follow through with his treatment recommendations because the plaintiff moved out of state and refused to relocate his treatment to a nearby VA because he preferred to be treated at the VAMC in Augusta, Georgia. (Tr. 29, 30, 32, 505, 914, 921). The ALJ's opinion also considered whether the plaintiff reported having transportation issues. (Tr. 31, 919). The plaintiff failed to undergo mental health treatment, yet he underwent eight weeks of physical therapy for his right shoulder between December 4,

35

2012, and February 13, 2013, with good responses. (Tr. 25. 255-26). The ALJ properly concluded that the plaintiff's noncompliance with his mental health treatment evidences that his mental impairments were not as severe, persistent, or as limiting as the plaintiff alleged.

The plaintiff's compliance with his physical health treatment regarding his shoulder, considered together with the plaintiff's non-compliance with his mental health treatment, demonstrate that the plaintiff's statements and alleged symptoms regarding his mental health were inconsistent with his actual mental health symptoms, and that his alleged symptoms were not as limiting as he claimed. Moreover, the plaintiff's inconsistent statements and testimony regarding the how often he used an illegal drug, further demonstrates the plaintiff's lack of credibility. Accordingly, the plaintiff failed to meet his burden of providing evidence to support his allegations of disabling pain or other symptoms prior to the expiration of his insured status.

The ALJ also properly considered the relevant evidence in assessing the plaintiff's allegations and performed her duty as the trier of fact of weighing and resolving any conflicts in the evidence. The undersigned finds that there was no error because substantial evidence supports the ALJ's credibility finding. The ALJ articulated reasons supported by substantial evidence for her adverse credibility determination. *Werener v. Comm'r of Soc. Sec.*, 421 F. App'x 935, 938 (11th Cir. 2011).

## V. SUBSTANTIAL EVIDENCE SUPPORTS THE HYPOTHETICAL QUESTION UPON WHICH THE ALJ RELIED IN FINDING THE PLAINTIFF COULD PERFORM OTHER WORK.

The plaintiff contends that the ALJ failed to present a hypothetical to the VE that included all the mental restrictions in the ALJ's opinion. (Pl.'s Br. at 19). Specifically, the plaintiff asserts that the ALJ's finding of the plaintiff's moderate limitations in social functioning and

concentration, persistence, or pace were not included in the hypothetical question. (*Id.*). However, the ALJ's ratings that the plaintiff had moderate difficulties in the broad functional areas of social functioning and concentration, persistence, or pace were two of four ratings the ALJ made in assessing the plaintiff's impairments. (Tr. 26-28). As stated by the ALJ, the ratings are not an assessment of a claimant's RFC, but instead, are used to rate the severity of a claimant's mental impairments at steps two and three of the sequential evaluation process. (Tr. 27) *See* 20 C.F.R. § 404.1520(a)(d)(1), (d)(2); SSR 96-8p. In *Winschel*, the Eleventh Circuit found "[n]othing precludes the ALJ from considering the results of the former in his determination of the latter." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180-81 (11th Cir. 2011) (concluding "the ALJ did not indicate that medical evidence suggested [plaintiff's] ability to work was unaffected by [the] limitation, nor did he otherwise implicitly account for the limitation in the hypothetical."). However,"[w]hen medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace, courts have concluded that limiting the hypothetical to include only unskilled work sufficiently accounts for such limitations." *Id*. at 1180.

As the Eleventh Circuit noted in *Winschel*, other circuits have held that "[h]ypothetical questions adequately account for a claimant's limitations in concentration, persistence, and pace when the questions otherwise implicitly account for these limitations." *Id*. at 1180.; *see White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 288 (6th Cir. 2009) (concluding that the ALJ's reference to a moderate limitation in maintaining "[a]ttention and concentration" sufficiently represented the claimant's limitations in concentration, persistence, and pace). In addition, a moderate limitation or moderate difficulties in a broad area of functioning has little or no meaning in terms of a

claimant's RFC. *See Winschel*, 631 F.3d at 1180. The relevant evidence of record supports the ALJ's assessment of the plaintiff's mental limitations and further supports the ALJ's RFC finding that the plaintiff had moderate difficulties in maintaining social functioning and concentration, persistence, or pace. (Tr. 28-34). *See Winschel*, 631 F.3d at 1180-81.When the ALJ asked the VE the hypothetical question, she included and implicitly accounted for all of the plaintiff's impairments. *Id*. at 1181. Thus, the VE's testimony is substantial evidence and supports the ALJ's conclusion that the plaintiff could perform significant numbers of jobs in the national economy. *Id*.

In accordance with the foregoing, the undersigned finds that the ALJ properly considered all of the evidence of the record, including all of the medical evidence in the record, in its totality, in assessing the plaintiff's RFC. 20 C.F.R. § 404.1545(a)(3). The undersigned finds that the ALJ ruled properly when determining that the plaintiff is not disabled.

## RULING

In accordance with the foregoing, it is

**ORDERED AND ADJUDGED** that the decision of the Commissioner is **AFFIRMED**, the Plaintiff's Motion for Summary Judgment (DE# 17, 02/05/17) is **DENIED**, and the Defendant's Motion for Summary Judgment (DE# 21, 04/17/17) is **GRANTED** in accordance with this Order.

DONE AND ORDERED at the United States Courthouse, Miami Florida this 24th day of August 2017.

JOHN J. O'SULLIVAN
UNITED STATES MAGISTRATE JUDGE

Copies to:
All Counsel of Record